**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AGA SHAREHOLDERS, LLC, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | Case No. 06 C 835 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| CSK AUTO, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff AGA Shareholders, LLC ("AGA") filed suit against defendant CSK Auto, Inc. ("CSK") for breach of a requirements contract. CSK promptly moved to dismiss AGA's complaint pursuant to Rules 12(b)(2) and (3) of the Federal Rules of Civil Procedure. Specifically, CSK argues that the complaint must be dismissed because the court does not have personal jurisdiction over CSK and, even if it did, a forum selection clause contained in the contract applicable to this dispute divests the court of jurisdiction. For the reasons detailed below, the court concludes that venue is improper under Rule 12(b)(3) because the forum selection clause requires that AGA's suit be filed in Arizona. Rather than granting the relief sought in CSK's motion to dismiss, however, the court instead exercises its discretion to transfer this case to the proper venue. As the court's holding on the venue issue is dispositive, the court does not consider whether it has personal jurisdiction over CSK under Rule 12(b)(2).

### I. BACKGROUND

This case concerns a business relationship between AGA and CSK that spanned more than four years but ended abruptly when CSK elected to discontinue purchasing AGA's products. The

1

court will recite the facts surrounding this relationship in favor of AGA,[1] as is customary when ruling on a 12(b)(3) motion to dismiss for improper venue. *See Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003); *Nagel v. ADM Investor Servs., Inc.*, 995 F. Supp. 837, 843 (N.D. Ill. 1998).

AGA was an Illinois corporation that was formed in 1928 as a family-owned manufacturing business.[2] Sometime in the 1960s AGA began to focus exclusively on remanufacturing automobile parts. Remanufacturing is a process whereby used or defective parts known in the automobile industry as "cores" are used by a manufacturer to rebuild viable parts for resale. AGA specialized in remanufacturing automobile alternators and starters. CSK, an Arizona corporation, is also involved in the automobile parts industry. Specifically, CSK owns and operates a national chain of more than 1,200 retail stores that sell automobile parts under names such as Checker Auto Parts.

In November of 1998, CSK Vice-President Michael Thompson ("Thompson") met AGA Vice-President of Sales Joseph Resnick ("Resnick") at a trade show in Las Vegas, Nevada. They discussed the possibility of CSK purchasing automobile parts from AGA, and one month later Thompson visited AGA's manufacturing plant in Illinois to review its operations. Thompson and Resnick met at another trade show in Las Vegas in early November of 1999, and at that time Thompson requested a price quote for remanufactured alternators and starters. Following the trade

---

[1]The facts are taken from the parties' submissions, which include a variety of documents as well as affidavits.

[2]AGA is actually a limited liability company organized under the laws of Illinois. However, the claims asserted by AGA were assigned to it by American Generator & Armature Company ("American Generator"), which was an Illinois corporation until it dissolved in 2004. Because AGA is the plaintiff in name only and the actions relevant to this lawsuit were taken by American Generator, AGA and American Generator will be jointly referred to as "AGA."

show, Thompson and Resnick began negotiating the product prices via telephone and fax. The men came to a preliminary agreement, and on November 24, 1999, Resnick met with Thompson at CSK's offices in Arizona to discuss the terms of a business relationship between AGA and CSK. At that meeting, Thompson and Resnick agreed that CSK would begin purchasing from AGA all of its requirements for remanufactured automotive and light-duty truck alternators and starters for resale in CSK's stores pursuant to CSK's Three-Year Warranty (OE Quality) Alternator and Starter Program ("the Program"). Thompson and Resnick also discussed and agreed upon most of the terms of the business relationship between their respective companies. However, their entire agreement was not immediately reduced to writing. Instead, Thompson gave Resnick a copy of a standardized CSK form entitled "Master Vendor Agreement," along with its accompanying Terms and Conditions (hereinafter jointly referred to as "MVA"), and an addendum to the MVA ("Addendum 1") that allowed the parties to modify the allowances, discounts, and warranties set forth in the MVA. These documents contained many of the provisions that the parties had agreed would govern their relationship but were also left blank in several areas. Resnick took the MVA and Addendum 1 back to Illinois with him and completed them by filling in the blank terms with language he and Thompson had agreed to during their meeting. Resnick also drafted a second addendum ("Addendum 2"), which contained some additional terms he and Thompson had discussed that were not covered by Addendum 1. Resnick signed all of the documents on behalf of AGA on November 29, 1999, and returned them to Thompson along with a letter and copies for Thompson to sign and return to AGA.

The MVA, Addendum 1, and Addendum 2 set forth many of the terms of the business relationship between CSK and AGA, including discounts, allowances, warranties, and ordering and

delivery terms. Several particular provisions of the MVA that are relevant to the issues before the court warrant mention. The MVA itself provided that "[t]he Terms and Conditions, and any Addenda or other documents referenced in this document are incorporated herein as part of this MVA and made a part hereof. This MVA shall govern all purchases made by CSK from [AGA] during the term of this Agreement unless the parties agree specifically in writing to the contrary." Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 5. While the MVA purported to be the baseline for the parties' relationship, it did not purport to be the final word. Instead, the MVA stated that "[t]he parties may from time to time mutually agree to additional allowances, discounts, and warranties, or to revise the foregoing allowances, discounts, and warranties, provided that any such mutual agreement is documented in an Addendum to this MVA or in another writing(s) executed by both parties." *Id.*

Of particular importance, the "Term and Termination" section of the MVA provides as follows:

> This MVA shall only become effective upon execution by both parties. The term of the MVA shall commence upon the date first written on page one of this MVA and shall continue until January 31, 1999. Thereafter the term shall be automatically renewed for successive one (1) year terms unless within thirty days prior to such renewal one party sends written notice to the other party that it does not intend to renew the MVA.

*Id.* at 7. In addition, the "Applicable Law" section of the MVA states:

> The MVA is made with reference to and under the laws of the State of Arizona which shall be deemed to govern the validity and interpretation of the MVA and the rights and remedies of the parties hereunder. Any legal action instituted by the parties arising out of this MVA shall be within, and the parties hereto stipulate to the jurisdiction of, the Courts of Maricopa County, Arizona.

*Id.* at 10.

Neither Thompson nor any other CSK employee ever signed the MVA, Addendum 1, or

Addendum 2. Thompson did, however, sign a separate addendum to the MVA that contained additional terms of the parties' business relationship during his meeting with Resnick in Arizona. On November 24, 1999, Thompson and Resnick both signed a document denoted as the Store Conversion Support Addendum to the Master Vendor Agreement ("Conversion Addendum").[3] In the Conversion Addendum, AGA agreed to support the costs associated with CSK's conversion of recently acquired stores by giving CSK a five percent discount on all invoices during a certain time frame. According to AGA, Resnick signed the Conversion Addendum because Thompson told him that AGA's conversion support was an essential component of the business relationship since CSK's previous supplier – whom AGA was replacing – had agreed to such a discount. AGA asserts that its agreement to the terms of the Conversion Addendum was a pre-condition to the negotiation of the remaining terms of the business relationship.

As AGA notes, the MVA and the addenda referenced above did not cover all aspects of the parties' relationship. For example, the parties initially agreed that CSK would receive a 9.5 percent discount on AGA products, a discount that included the five percent new store conversion discount, a one percent trade show allowance discount, a one percent prompt payment discount, and a 2.5 percent advertising discount. While the MVA and its addenda referenced the first three discounts, they did not mention the 2.5 percent advertising discount. The MVA also did not discuss in any detail the "core bank," which was an important component of the parties' relationship.[4] During their

---

[3]While originally dated September 27, 1999, the signature lines of the Conversion Addendum indicate that it was signed on November 24, 1999, and AGA conceded in its briefing that this is the date the document was executed.

[4]It should be noted, however, that AGA's argument that the MVA does not even address the issue of cores is not entirely accurate. Addendum 1 states that "AGA will pick up all warranty and core upon delivery of product to CSK Auto, Inc. Warehouses." Mem. in Supp. of

meeting at CSK's offices in November of 1999, Thompson told Resnick that CSK owned a large number of starter and alternator cores and that CSK wanted to deliver them to AGA to use in remanufacturing parts for CSK. The parties agreed that CSK would ship cores to AGA, to be stored in a "core bank" at AGA's warehouse in Illinois, and that AGA would issue credits to CSK for the value of the cores that AGA used to remanufacture parts to fill CSK purchase orders on a rolling basis. The first such shipment of cores was sent to AGA in December of 1999, and CSK continued to send cores to AGA throughout their relationship.

The parties formally began doing business on January 1, 2000. From that point until March of 2004, CSK purchased all of its requirements for remanufactured alternators and starters for resale in CSK's stores under the Program from AGA. During this time, the terms of the parties' agreement – including product prices, payment terms, discounts, and advertising allowances – were frequently modified. The record reflects that these modifications were made in a variety of ways, including by oral agreement, e-mail, written agreement, and addenda to the MVA. Nearly all of the correspondence and documentation in the record references the MVA or terms that were contained within the MVA.[5]

In August of 2001, Resnick sent Thompson a document regarding the core bank. This document purported to "establish" a core bank (although the parties had apparently done so well over a year before) and contained terms the parties had agreed to orally. Aff. of Bobbi Smrtka,

Def.'s Mot. to Dismiss Ex.1 at 6.

[5]For example, the record contains several e-mail exchanges between the parties that discuss a variety of concerns that arose during the course of their relationship. In these exchanges, representatives for both parties refer to the MVA and discuss modifications in their relationship as well as terms already agreed to with reference to the MVA.

attached as Ex. D to CSK's Reply in Supp. of Mot. to Dismiss ("Smrtka Aff.") Ex. 1. The document stated that it would "be incorporated into the Master Vendor Agreement (MVA) between CSK and AGA."[6] *Id.* During this same time period, the parties also negotiated a modification in the discount AGA was providing to CSK. This modification is reflected in an addendum to the MVA entitled the "2001/2002 Gateway West: Focus on the Future Agreement" ("FFA"). *Id.* Ex. 2. Under the FFA, AGA agreed to increase CSK's discount on purchases from AGA to ten percent in return for advertising exposure provided by CSK. The agreement was entered pursuant to CSK's "Let's Work Together" ("LWT") program, a program which is apparently intended to promote a mutually beneficial relationship between CSK and its vendors and is renewed on a yearly basis. Importantly, the FFA stated that "this Addendum shall supplement the terms set forth in the Master Vendor Agreement." *Id.* The FFA was signed by AGA on August 17, 2001, and by CSK on August 23, 2001.

In 2002, the parties executed another addendum to the MVA pursuant to the LWT program. Their agreement is reflected in a document entitled the "2003/2003 Let's Work Together Master Vendor Agreement Addendum" ("2002 LWT"). *Id.* Ex. 3. In the 2002 LWT, the parties agreed to an incentive-based discount whereby AGA would again provide CSK with a ten percent discount but would also give CSK an additional one percent allowance if CSK's purchases exceeded ten million dollars during the 2003 calendar year. Like the FFA, the 2002 LWT provided that "this Agreement shall supplement the terms set forth in the Master Vendor Agreement." *Id.* AGA agreed to the 2002 LWT on July 26, 2002, and CSK signed the document on September 11, 2002.

---

[6]It should be noted that the document was signed by Resnick on behalf of AGA but was not signed by anyone for CSK.

Roger Weiss ("Weiss"), Merchandise Manager for CSK, visited AGA's plant in Illinois from October 28-29, 2002. At these meetings, the parties discussed concerns with warranty returns, the core bank, and future business. During this same time period, CSK decided to update the starter and alternator testing equipment it carried in its stores. On January 30, 2003, Weiss sent a proposal to AGA regarding the new testing equipment. According to Weiss' letter, CSK wanted its vendors to share the cost of purchasing and installing the new equipment. CSK proposed that AGA contribute $1.35 million to the cost of the testing equipment, to be paid quarterly over a three year period. AGA countered with a revised proposal whereby it agreed to pay for a reduced portion of the testing equipment and also requested several modifications and updates in the parties' business relationship as well as CSK's commitment to continue doing business for a five year period. This stimulated an extended period of negotiations between the parties which culminated in the execution of a letter agreement ("2003 Agreement") on April 11, 2003.

The 2003 Agreement modified the parties' business relationship in several important respects. First, the parties agreed to update the AGA products purchased by CSK for the Program in 2003. According to the 2003 Agreement, "[f]or AGA to meet the goals of implementing and investing in CSK's 'New Testing Program,' AGA's 3-Year Product Line needs to continually grow, while also addressing reduction of the current core bank." Compl. Ex. A. Accordingly, CSK agreed to purchase at least $1.7 million in new products during 2003. The 2003 Agreement noted that "AGA will *Guarantee Sale* of any New Part Numbers *ADDED* to the 3-Year Program as part of the 2003 Update . . . creating a no-risk investment for CSK." *Id.* Second, AGA agreed to help cover the cost of the new testing equipment by increasing the discount CSK was receiving under the FFA and the 2002 LWT. The 2003 Agreement noted that the discount had been ten percent and provided

that CSK would also receive a 0.5 percent "incremental discount" and an additional 0.5 percent LWT discount. Thus, the 2003 Agreement stated that "[w]ith the Incremental Discount for New Testers and LWT, the "Advertising" discount line item will change to read 11 %." *Id.* This was to serve as the parties' LWT agreement until December 31, 2004. Third, the parties agreed to an incentive credit designed to promote sales and reduce warranty returns. Finally, the 2003 Agreement set forth several miscellaneous terms applicable to the modifications. Most importantly, these terms contained a provision that the parties would continue doing business for five years, until April 10, 2008. The 2003 Agreement was signed by representatives of both CSK and AGA on April 11, 2003.

After the 2003 Agreement was executed, CSK continued to purchase all of its requirements for the Program from AGA, and the modifications and discounts contained in the 2003 Agreement were incorporated into CSK's purchase orders. On January 14, 2004, however, Kyle Huden ("Huden"), CSK's Merchandising Manager, called Resnick and told him that CSK was considering terminating AGA as its supplier. On January 30, 2004, Thompson and Huden called Resnick and informed him that CSK would be terminating AGA as its supplier because another supplier had offered CSK a better deal. In these conversations, CSK's representatives did not mention the MVA or its termination terms, and did not provide AGA with written notice of termination. The parties ceased doing business on March 4, 2004. AGA subsequently sought payment for invoices that it had sent to CSK during the preceding months, but CSK refused to pay because it believed that it was owed credits for the cores remaining in the core bank. AGA was forced to terminate its operations as a result of the loss of its business relationship with CSK.

On February 14, 2006, AGA filed a four-count complaint against CSK, asserting claims for

breach of contract. Rather than answering AGA's complaint, CSK moved to dismiss it for lack of personal jurisdiction and improper venue. The parties submitted extensive briefing on CSK's motion, including supplemental briefing ordered by the court after its review of the initial briefs.[7] This matter is now fully briefed and ripe for decision.

## III. ANALYSIS

In its complaint, AGA alleges that CSK breached the 2003 Agreement by terminating its business relationship with AGA more than four years prior to the end of the term the parties agreed to. CSK has moved to dismiss AGA's complaint on two separate grounds: (1) for lack of personal jurisdiction under Rule 12(b)(2) of the Federal Rules of Civil Procedure; and (2) for improper venue under Rule 12(b)(3). As noted previously, only CSK's second contention will be addressed because the court's ruling on this issue disposes of the case in this court.

CSK argues that AGA's complaint must be dismissed under Rule 12(b)(3) because the forum selection clause contained in the MVA requires that AGA's suit be brought in Arizona, not Illinois. CSK is correct that a motion to dismiss for improper venue due to a forum selection clause is properly brought under Rule 12(b)(3) in this circuit. *See Cont'l Ins. Co. v. M/V Orsula*, 354 F.3d 603, 606-07 (7th Cir. 2003). The plaintiff bears the burden to establish that venue is proper. *Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 913 (N.D. Ill. 2003). When ruling on a motion to dismiss under 12(b)(3), however, the court assumes the truth of the plaintiff's allegations unless they are contradicted by the defendant's affidavits. *See*

---

[7]The court felt that the parties had not adequately addressed several issues related to venue, and therefore ordered the parties to submit limited supplemental memoranda and responses. *AGA Shareholders, L.L.C. v. CSK Auto, Inc.*, No. 06 C 835 (N.D. Ill. Oct. 13, 2006) (order requesting additional briefing).

*Nagel v. ADM Investor Servs., Inc.*, 995 F. Supp. 837, 843 (N.D. Ill. 1998).  The court may consider facts outside the complaint in order to determine whether venue is proper; in doing so, the court resolves any factual conflicts and draws all reasonable inferences in favor of the plaintiff. *Interlease*, 262 F. Supp. 2d at 913.  *Id.*

A forum selection clause contained in an enforceable contract is presumed valid and will generally be enforced.  *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210 (7th Cir. 1993); *Zenith Elec. Corp. v. Kimball Int'l Mfg., Inc.*, 114 F. Supp. 2d 764, 774 (N.D. Ill. 2000).  This is particularly true where the contractual language makes clear that a certain venue is mandatory and exclusive.  *See Cont'l Ins. Co.*, 354 F.3d at 607; *Frietsch v. Refco, Inc.*, 56 F.3d 825, 829 (7th Cir. 1995); *Hull 753 Corp. v. Elbe Flugzeugwerke*, 58 F. Supp. 2d 925, 927 (N.D. Ill. 1999).  However, the court may decline to enforce a valid forum selection clause if the resisting party demonstrates that enforcement will be unreasonable or unjust.  *See Cont'l Ins. Co.*, 354 F.3d at 607 (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)); *Hugel*, 999 F.2d at 210.  The burden on the resisting party is heavy, and "absent a showing that the contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of his day in court," the clause will be enforced.  *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1290-91 (alteration in original, citation and internal quotation mark omitted).

In the case before the court, the language of the forum selection clause at issue provides as follows: "Any legal action instituted by the parties arising out of this MVA shall be within, and the parties hereto stipulate to the jurisdiction of, the Courts of Maricopa County, Arizona."  Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 5.  There is no question that this language is mandatory and exclusive; it virtually mirrors a clause found to be mandatory and exclusive by the United States

Court of Appeals for the Seventh Circuit in *Continental Insurance Co.*, 354 F.3d at 607. Nor does AGA argue to the contrary. In fact, AGA does not even argue that the forum selection clause itself is invalid. Rather, AGA's arguments center on the enforceability and applicability of the MVA. Although AGA raises a variety of arguments, when distilled they can be summarized as follows: (1) the MVA never became a binding, enforceable contract, and so the forum selection clause contained within it does not apply; (2) even if the MVA is valid and enforceable, AGA's claims arise from the 2003 Agreement and not the MVA, and so the forum selection clause in the MVA, by its own terms, does not apply; and (3) Illinois is a more equitable and appropriate forum for this litigation. These arguments will be addressed in turn.

A. *The Parties Mutually Agreed that the MVA Would Govern Their Relationship*

AGA's first argument is that the MVA is not a binding contract and therefore the forum selection clause is not applicable. In determining whether a contract exists, a federal court applies substantive state law governing the formation of contracts. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 795 (7th Cir. 1999). When the district court's subject matter jurisdiction is premised on diversity of citizenship under 29 U.S.C. § 1332 (2000), the district court applies the substantive law of the forum state. *Davis v. G.N. Mortgage Corp.*, 396 F.3d 869, 876 (7th Cir. 2005). This includes applying the forum state's choice-of-law rules if the substantive law of more than one jurisdiction is in issue. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000); *Nucor Corp. v. Aceros y Maquilas de Occidente,* 28 F.3d 572, 581 (7th Cir. 1994). The district court is to apply the substantive law of the state whose law governs the dispute as it believes the courts of that state would. *See Davis*, 396 F.3d at 876.

In this case, the court's jurisdiction is premised on diversity of citizenship, and so Illinois

contract law appears to govern the issue of whether the MVA is a valid, enforceable contract. However, the MVA itself contains a choice-of-law provision stating that Arizona law governs this issue, and the parties' business relationship involved both Illinois and Arizona. In their initial briefing on CSK's motion to dismiss, the parties relied solely on Illinois law in addressing this issue. However, because it was concerned about the possibility of a conflict between the substantive law of Illinois and Arizona, the court gave the parties the opportunity to provide additional briefing regarding whether the court should apply Illinois or Arizona law to determine if the MVA is binding. The parties did so, and they agree that Illinois law should govern this issue and that the relevant principles of contract law are the same in each state. In addition, AGA conducted a "most significant contacts" analysis – as is proper under Illinois law when determining which state's law to apply to a contractual dispute – and concluded that Illinois law is appropriate. *See Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). The court will therefore abide by the parties' wish and apply Illinois law. *See Cont'l Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 734 n.8 (7th Cir. 2005) (applying Illinois contract law when parties did not dispute its applicability); *Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state . . . .").

The principles of Illinois contract law that must be applied to this case are well-settled. In Illinois, a valid contract requires an offer, acceptance, and consideration. *Van Der Molen v. Washington Mut. Fin., Inc.*, 835 N.E.2d 61, 69 (Ill. App. Ct. 2005); *DiLorenzo v. Valve & Primer Corp.*, 807 N.E.2d 673, 678 (Ill. App. Ct. 2004). In addition, there must be mutual assent by the parties – i.e., a meeting of the minds – to the essential terms and conditions of the contractual

relationship. *IMI Norgren, Inc. v. D & D Tooling Mfg., Inc.*, 306 F. Supp. 2d 796, 801-02 (N.D. Ill. 2004) (citing *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1282 (Ill. App. Ct. 2002)); *Reese v. Forsythe Mergers Group, Inc.*, 682 N.E.2d 208, 213 (Ill. App. Ct. 1997); *Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1237 (Ill. App. Ct. 1995). To be enforceable, a contract's terms must be reasonably certain or able to be determined. *See DiLorenzo*, 807 N.E.2d at 678; *Pritchett*, 773 N.E.2d at 1282. In other words, the court must be able to ascertain what it is the parties have agreed to do, and if the essential terms are so uncertain that the court cannot make this determination, there is no contract. *See IMI Norgren*, 306 F. Supp. 2d at 802; *DiLorenzo*, 807 N.E.2d at 678; *Reese*, 682 N.E.2d at 214. However, a contract is not rendered unenforceable merely because certain terms are missing or are left to be agreed upon. *DiLorenzo*, 807 N.E.2d at 678; *Pritchett*, 773 N.E.2d at 1282; *Reese*, 682 N.E.2d at 214. The existence of a contract is generally a question of fact, but when the relevant facts are not in dispute it is appropriate for the court to consider the issue as a matter of law. *See Liu*, 191 F.3d at 795; *Reese*, 682 N.E.2d at 213. The proponent of a contract bears the burden of establishing its existence, but once the proponent makes a prima facie showing that a contract exists the burden shifts to the opponent to demonstrate the opposite. *See Liu*, 191 F.3d at 795; *IMI Norgren*, 306 F. Supp. 2d at 802; *Reese*, 682 N.E.2d at 213.

AGA's primary argument is that the MVA is not an enforceable contract because it was never signed by a representative of CSK. The Terms and Conditions section of the MVA contains a paragraph that specifies as follows: "This MVA shall only become effective upon execution by both parties." Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 7. This paragraph, argues AGA, required that both parties sign the MVA as a condition precedent to the formation of a binding

contract between CSK and AGA. It is true that under Illinois law a written contract generally does not become binding until it is signed by the parties. *See Sterdjevich v. RMK Mgmt. Corp.*, 796 N.E.2d 1146, 1157 (Ill App. Ct. 2003). In addition, where it is clear the parties intended that an agreement would not become binding until it was formally executed, then the agreement is not binding if the parties have not done so. *See Consol. Bearings Co. v. Ehret-Krohn Corp.*, 913 F.2d 1224, 1231 (7th Cir. 1990) (citing *Lynge v. Kunstmann*, 418 N.E.2d 1140, 1144 (Ill. App. Ct. 1981)); *Johnson & Bell, Ltd. v. ASA Legal Sys.*, No. 99 C 8327, 2000 WL 139472, at *5 (N.D. Ill. Jan. 31, 2000) (citing *Leekha v. Wentcher*, 586 N.E.2d 557, 561 (Ill. App. Ct. 1991)). According to AGA, the existence of the paragraph cited above indicates that the parties did not mutually assent to the MVA because CSK did not sign the MVA.

In response, CSK first argues that even if its signature of the MVA was a condition precedent to the MVA becoming binding, it signed the Conversion Addendum at the same time the parties agreed to the terms in the MVA. Because the Conversion Addendum is an addendum to the MVA and references the MVA, CSK argues, signing the Conversion Addendum is the same as signing the MVA. CSK is right about one thing; even under AGA's view of the facts, the Conversion Addendum was signed by both of the parties on November 24, 1999, during the parties' negotiations in Arizona. However, AGA argues that CSK would not agree to do business with it unless AGA agreed to the terms of the Conversion Addendum, thus making the Conversion Addendum a condition precedent to continued negotiations. AGA asserts that the Conversion Addendum could not possibly operate as an execution of the MVA because the Conversion Addendum was executed before the parties even discussed the terms of the MVA. It is possible that the parties' execution of the Conversion Addendum operated as their execution of the MVA, especially given AGA's

assertions that the parties agreed on the terms of their relationship during their meeting in Arizona. Nonetheless, the court must resolve discrepancies in favor of AGA at this stage in the litigation. The court therefore finds that the parties' execution of the Conversion Addendum did not operate as an execution of the MVA.[8]

CSK next argues that the MVA is enforceable because the parties' conduct indicates their mutual assent. This is a much stronger argument, and it raises what is ultimately the determinative issue in this case. Under Illinois law, "'[t]he object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties.'" *Consol. Bearings Co.*, 913 F.2d at 1231 (quoting *Lynge*, 418 N.E.2d at 1144). "If a document is signed by the party being charged, the other party's signature is not necessary if the document is delivered to that party and she indicates acceptance through performance." *Meyer*, 652 N.E.2d at 1239; *see also Consol. Bearings Co.*, 913 F.2d at 1231 (same); *Johnson & Bell, Ltd.*, 2000 WL 139473, at 5 (same). The crux of the issue in a case such as this hinges on the parties' intent. *See Consol. Bearings Co.*, 913 F.2d at 1231; *Johnson & Bell, Ltd.*, 2000 WL 139473, at * 5.

In this case, the court concludes that the parties' submissions, even viewed in favor of AGA, demonstrate that the parties mutually assented to the MVA – the lack of a signature by CSK notwithstanding. The MVA itself is signed by AGA, the party to be charged. Moreover, the parties' submissions demonstrate that they routinely acted in accordance with the MVA and considered the MVA to be the baseline for their relationship. AGA itself admits that the parties agreed to the terms

---

[8]CSK also contends that the parties' execution of subsequent addenda operated to execute the MVA. The court agrees that the parties' execution of subsequent addenda such as the FFA and the 2002 LWT are probative, but believes that these addenda demonstrate the parties' mutual assent to the MVA through their conduct.

of the MVA during their meeting in Arizona in late November of 1999 and notes that the additions Resnick made upon his return to Illinois were terms the parties had already agreed to. Numerous documents were subsequently drafted that refer to the MVA and purport to modify certain terms of the MVA. In particular, the FFA and the 2002 LWT both modified discounts the parties agreed to in the MVA, and were signed by both parties. In addition, the correspondence submitted by the parties demonstrates that the parties believed the MVA was effective. For example, an e-mail sent to AGA representatives by Abramovich on June 12, 2001, following his visit to AGA's plant in Illinois, states as follows: "Any units that are considered BROKEN, CSK gets warranty credit less an agreed upon standard amount as per the Master Vendor Agreement." Aff. of Joseph Resnick, Ex. 8. Similarly, an e-mail sent from Resnick to CSK representatives on May 1, 2001, regarding a certain reimbursement the parties had agreed to notes that "[t]his is to be made as an addendum, and incorporated in to [sic] the CSK/AGA Master Vendor Agreement." Smrtka Aff. Ex. 4. These are but two examples; a majority of the documents and correspondence submitted by the parties refer to the MVA. The parties' dealings thus corroborate the language of the MVA, which states that "[t]his MVA shall govern all purchases made by CSK from [AGA] during the term of this Agreement." Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 5. Taken as a whole, the parties' submissions clearly evidence their mutual assent to the MVA and their belief that the MVA governed their relationship. In addition, the terms of the MVA and the other documents that governed the parties business relationship are reasonably specific such that a court can determine what AGA and CSK agreed to. Accordingly, the court finds that the MVA constitutes a valid, enforceable contract under Illinois law. *See IMI Norgren*, 306 F. Supp. 2d at 802; *DiLorenzo*, 807 N.E.2d at 678; *Reese*, 682 N.E.2d at 214.

17

Before proceeding, the court must address several additional arguments raised by AGA. First, AGA argues that the parties' intent regarding contract formation is a factual issue that should not be resolved by the court. AGA is right – intent is a question of fact under Illinois law. *See, e.g.*, *Liu*, 191 F.3d at 795 ("In Illinois, the question of the parties' intent as to contract formation is a factual question . . . ."). Nonetheless, the court does not believe it is appropriate to delay the resolution of this issue. As the Seventh Circuit stated in *Friestch v. Refco, Inc.*, 56 F.3d 825, 831 (7th Cir. 1995), "judicial economy requires selection of the proper forum at the earliest possible opportunity." The parties submitted the materials they wished the court to review in rendering its decision, and based on those materials the court finds that the MVA is a binding contract. It is possible that the court in Arizona will find differently when presented with a full record, but this court believes it has arrived at the correct resolution of the limited issue before it – whether venue is proper.

Second, AGA argues that the MVA cannot be binding because it was incomplete and many terms were left blank. AGA itself undermines this argument by asserting that Thompson and Resnick agreed to the terms of the parties' relationship during their meeting at CSK's offices in November of 1999 and noting that Resnick thereafter merely filled in the MVA with terms the parties had agreed to. AGA's argument is also not supported by the law; in Illinois, a contract need not be complete to be enforceable. *See DiLorenzo*, 807 N.E.2d at 678. Moreover, the MVA itself specifically contemplated that it did not fully encompass the parties' agreement and that the parties would agree on additional terms in the future. Specifically, the MVA provided that "[t]he parties may from time to time mutually agree to additional allowances, discounts, and warranties, or to revise the foregoing allowances, discounts, and warranties, provided that any such mutual agreement

is documented in an Addendum to this MVA or in another writing(s) executed by both parties." Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 5. This appears to be exactly what the parties did when they modified the contract by, for example, agreeing to the FFA and the 2002 LWT. *See, e.g.*, *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004) ("Modification of a contract normally occurs when the parties agree to alter a contractual provision or to include additional obligations, while leaving intact the overall nature and obligations of the original agreement."). There is no question that the MVA did not cover certain aspects of the parties' relationship, such as the core bank. Nonetheless, the MVA does contain the essential terms, and the parties agreed that it would govern their relationship. Thus, the mere fact that the MVA does not reflect the parties' entire agreement is of no legal consequence.[9]

Finally, AGA argues that its signature of the MVA operated as a counteroffer, which CSK never accepted because CSK never signed the MVA. Here, AGA is grasping at straws. Under Illinois law, a counteroffer operates as a rejection of the original offer and the counteroffer must then be accepted before a contract exists. *See People v. Henderson*, 809 N.E.2d 1224, 1232 (Ill. 2004). However, AGA's own assertions belie its argument and indicate that the MVA was not a counteroffer. As previously noted, AGA argues that the parties had already agreed to the terms of their relationship when Resnick took the MVA back to Illinois and completed it. Resnick's letter to Thompson wherein he conveyed the MVA back to CSK states as much, noting that he simply added terms to the MVA and its addenda that the parties had agreed to during their meeting in

---

[9]AGA also argues that CSK did not always comply with the MVA – for example, when CSK terminated the parties' business relationship. This may be true, but if so it reflects a breach and not the unenforceability of the MVA, given that the parties' course of dealing demonstrates their mutual intent to be bound by the MVA.

Arizona.  The court thus rejects AGA's argument that the MVA was a counteroffer.

*B.  AGA's Suit Arises From the MVA*

AGA also argues that even if the MVA is valid and enforceable the forum selection clause is not applicable because this lawsuit arises from the 2003 Agreement, not the MVA.  AGA notes that the forum selection clause, by its own terms, only applies to actions arising from the MVA.  CSK's alleged breach, however, is of the five-year business term contained within the 2003 Agreement.  According to AGA, this means that 2003 Agreement, which has no forum selection clause, is the contract applicable to this lawsuit.

"[A]ll disputes the resolution of which arguably depend on the construction of an agreement 'arise out of' that agreement" for purposes of determining the applicability of a forum selection clause." *Omron Healthcare, Inc. v. MacLaren Exp. Ltd.*, 28 F.3d 600, 603 (7th Cir. 1994) (citing *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642-43 (7th Cir. 1993)); *see also Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) (holding that the plaintiffs' claims arose from a certain contract because the subject matter of the plaintiffs' suit was "intertwined" with requirements referred to in the contract).  Thus, the question before the court is whether the resolution of this suit case arguably requires the construction of the MVA; if so, AGA's suit arises from the MVA and therefore the forum selection clause applies.

The court concludes that AGA's suit arises from the MVA.  It is true that the specific breach complained of by AGA is a breach of the 2003 agreement, for it is that agreement that CSK allegedly violated when it ceased doing business with AGA in 2004.  Nonetheless, AGA's argument that the parties did not intend the 2003 Agreement to supplement the MVA is misguided.  The 2003 Agreement contained only a few terms, and did not purport to broadly govern the parties'

relationship. Instead, it changed a few of the terms pursuant to which the parties were previously doing business. For example, the 2003 Agreement updated the line of products CSK was already purchasing from AGA for the Program and changed the discounts the parties had previously agreed to in the MVA, the FFA, and the 2002 LWT in order to facilitate CSK's purchase of new testing equipment. Thus, the 2003 Agreement appears to have simply *modified* the parties' business relationship. *See Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004) ("A 'modification' of a contract is a change in one or more respects which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect undisturbed."). As discussed above, the record indicates that the parties believed that the MVA governed their relationship. Thus, if the 2003 Agreement modified the parties' business relationship, it necessarily modified the MVA. This conclusion is supported by the fact that the MVA specifically contemplated such future agreements; the MVA stated that the parties could "revise the foregoing allowances, discounts, and warranties, provided that any such mutual agreement is documented in an Addendum to this MVA or in another writing(s) executed by both parties." Mem. in Supp. of Def.'s Mot. to Dismiss Ex.1 at 5. This appears to be exactly what AGA and CSK did when they executed the 2003 Agreement. Because the MVA and the additional agreements the parties reached prior to the 2003 Agreement will necessarily have to be interpreted in order to determine what the parties' business relationship consisted of, it cannot be said that this dispute arises solely out of the 2003 Agreement, as AGA contends. Accordingly, the court holds that AGA's suit arises from the MVA, and the forum selection clause is applicable.

## C. *Arizona is the Appropriate Forum for this Litigation*

Having concluded that the MVA is binding and applicable to this dispute, the sole remaining

question before the court is whether the forum selection clause should be applied. AGA argues that it would be financially burdensome for it to litigate this dispute in Arizona, and that it will be more difficult for AGA to secure witnesses – many of whom are former employees – to testify if this case is transferred. AGA's arguments are nothing more than an assertion that Arizona is an inconvenient forum as compared to Illinois. This is insufficient to defeat application of the forum selection clause. In order escape the clause's application, AGA must show that the clause is unreasonable or unjust. *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 210 (7th Cir. 1993). This is a heavy burden, and to carry it AGA must demonstrate that Arizona is such a gravely difficult and inconvenient forum that if this case is transferred it will, for all practical purposes, be denied its day in court. *See Zenith Elec. Corp. v. Kimball Int'l Man., Inc.*, 114 F.Supp. 2d 764, 774 (N.D. Ill. 2000). "The mere loss of live testimony by non-party witnesses ordinarily does not constitute such serious inconvenience so as to warrant setting aside a freely negotiated forum selection clause." *Linc Scientific Leasing v. Garwyn Radiology Ass.*, No. 96 C 1980, 1996 WL 754115, at *3 (N.D. Ill. Dec. 31, 1996). AGA has simply not carried its burden. Rather, AGA merely argues that Arizona is inconvenient, an argument that is waived by virtue of AGA's agreement to the MVA. *See Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1293 (7th Cir. 1989). Because AGA's arguments do not demonstrate that litigation in Arizona would be unreasonable or unjust, the court must enforce the forum selection clause.

28 U.S.C. § 1406(a) (2006) provides as follows: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, of if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." It is within the court's discretion to determine whether to dismiss or transfer a case under this section.

*Cont'l Ins. Co. V. M/V Orsula*, 354 F.3d 603, 608 (7th Cir. 2003). In this case the court exercises its discretion to transfer this case to the proper venue rather than dismissing it with prejudice, as CSK requests. The court concludes that it would not be in the interests of justice to deny AGA the opportunity to litigate potentially meritorious claims simply because it filed this suit in Illinois rather than Arizona, particularly when AGA has presented a colorable argument as to why it did so. The MVA provides that venue is proper in Maricopa County, Arizona, and the court has taken judicial notice that the United States District Court for the District of Arizona is located in that county. Accordingly, the court transfers this case to the United States District Court for the District of Arizona for further proceedings.

### III. Conclusion

For the foregoing reasons, the court grants in part and denies in part CSK's motion to dismiss. The court concludes that the forum selection clause in the MVA requires divests this court of jurisdiction because it requires that AGA's suit be brought in Arizona. However, the court declines to dismiss this case with prejudice, and instead chooses to transfer this case to the proper forum.


ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: December 14, 2006